FILED

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

2015 SEP -8 PM 1:47



US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

| | |
|---|---|
| [UNDER SEAL],<br><br>          Plaintiffs,<br><br>v.<br><br>[UNDER SEAL],<br><br>          Defendants. | Case No. 6:15-cv-1457-Or-40GJK<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 et seq.]**<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT ENTER ON PACER**<br>**DO NOT PLACE IN PRESSBOX**<br><br>**JURY TRIAL DEMANDED** |

## DOCUMENT TO BE KEPT UNDER SEAL

Christopher Casper
FBN: 48320
ccasper@jameshoyer.com
James, Hoyer, Newcomer & Smiljanich, P.A.
4830 W. Kennedy Blvd, Suite 550
Tampa, Florida  33609-2589
Tel:  (813) 397-2300
Fax:  (813) 397-2310

Timothy P. McCormack
tmccormack@constantinecannon.com
Molly B. Knobler
mknobler@constantinecannon.com
Constantine Cannon, LLP
1001 Pennsylvania Ave. N.W., Suite 1300N
Washington, DC 20004

337766.2 338101.1

Tel: (202) 204-4524
Fax: (202) 204-3501
*Subject to pro hac vice admission*

Mary Inman
minman@constantinecannon.com
Constantine Cannon, LLP
4 Embarcadero Center, 14th Fl.
San Francisco, CA 94111
Tel: (415) 766-3507
Fax: (650) 636-9709
*Subject to pro hac vice admission*

Attorneys for [under seal]

2

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex</u> <u>rel</u>.<br>FARRELL GORDON,<br><br>         Plaintiffs,<br><br>vs.<br><br>TRACFONE WIRELESS, INC., SAFELINK<br>WIRELESS, ELITE MARKETING<br>GROUP, CENTRAL MARKETING<br>SYSTEMS, and WISSAM NASR,<br><br>         Defendants. | Case No.<br><br>COMPLAINT FOR VIOLATION OF THE<br>FEDERAL FALSE CLAIMS ACT [31 U.S.C.<br>§ 3729 *et seq.*]<br><br>**FILED IN CAMERA AND UNDER SEAL**<br>**PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT ENTER ON PACER**<br>**DO NOT PLACE IN PRESSBOX**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff-Relator Farrell Gordon, through his attorneys, on behalf of the United States of America (the "Government," or the "Federal Government"), for his Complaint against Defendants TracFone Wireless, Inc., SafeLink Wireless, Elite Marketing Group, Central Marketing Systems, and Wissam Nasr (collectively "Defendants"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I. <u>INTRODUCTION</u>

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and caused to be made by Defendants and/or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA" or the "Act").

2

2.      This *qui tam* case is brought against Defendants for knowingly defrauding the federal Government in connection with the Lifeline Program.  As alleged below, since at least 2014, and likely earlier, Defendants have engaged in a scheme to knowingly enroll ineligible individuals in the federal Lifeline Program and improperly bill the government agent who administers the program for Lifeline funds.

3.      As described in detail below, the Lifeline Program was established in 1985 to provide subsidized phone services to qualifying low-income consumers.  Individuals eligible for subsidized services under the Lifeline program are limited to those who have an income below 135% of the federal Poverty Guidelines or participate in certain enumerated federal need-based programs, such as Medicaid, Supplemental Security Income, or federal public housing assistance ("section 8").

4.      Defendant TracFone Wireless, Inc., through its SafeLink brand, contracts with the administrator of the Lifeline Program and receives payment for enrolling individuals in the program and providing them with wireless phones and services.

5.      Defendant Elite Marketing Group conducts marketing and sales for Defendant SafeLink Wireless in Florida and other states in which SafeLink conducts business.

6.      Defendant Wissam Nasr was a founding member of SafeLink Wireless and designed the electronic application used by Elite marketing staff to enroll consumers into SafeLink's Lifeline program.  Around the fall of 2013, Mr. Nasr became the National Director for Elite's SafeLink account.  Around January 2015, Mr. Nasr left Elite to start a new company, Central Marketing Systems.

3

337766.2 338101.1

7.     Defendant Central Marketing Systems contracts with SafeLink to market its Lifeline program in Florida and other states in which SafeLink conducts business.

8.     Defendants have engaged in a brazen scheme to fraudulently increase their payments under the Lifeline program. Defendants have directed sales staff to target and enroll in the Lifeline Program, individuals who did not categorically meet the eligibility requirements for the program – and who do not otherwise qualify based on their income – such as veterans, Medicare recipients, police officers (both active and retired), correctional officers and other prison employees, probation officers, postal workers, Emergency Medical Technicians ("EMT"), fire fighters, college students, inmates upon discharge from prison, or residents of Florida during hurricane season, without income or qualifying program-participation verification.

9.     Defendants have submitted and caused to be submitted thousands of fraudulent claims to the federal Lifeline Program for phones and services provided to individuals Defendants knew to be ineligible for the program. Likewise, Defendants have repeatedly created false records material to these false and fraudulent claims and conspired to create these false records and present these false claims. Finally, Defendants have failed to repay the Lifeline Program the funds they received for enrolling individuals they knew, or should have known, to be ineligible for the program.

10.     Defendants' conduct alleged herein violates the federal False Claims Act. The federal False Claims Act (the "FCA") was originally enacted during the Civil War. Congress substantially amended the Act in 1986 – and, again, in 2009 and 2010 – to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act,

4

which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

11. The FCA prohibits, *inter alia*: (a) "knowingly present[ing], or caus[ing] to be presented a false or fraudulent claim for payment or approval"; (b) "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim"; (c) "knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government"; and (d) conspiring to violate any of these sections of the FCA. 31 U.S.C. §§ 3729(a)(1)(A)-(C), (G).

12. A "claim" means "any request or demand, whether under a contract or otherwise, for money or property, and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee or agent of the United States; or (ii) is made to a contractor, grantee or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

13. "Knowingly" means that a person, with respect to information, "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

5

14.     Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

15.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

16.     Based on the foregoing laws, *qui tam* plaintiff Farrell Gordon seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants made or caused to be made by seeking payment from the government-provided funds of the Lifeline Program.

## II.     **PARTIES**

17.     Plaintiff-Relator Farrell Gordon is a resident of Orlando, Florida.  In September 2014, he began working for Defendant Elite Marketing Group as a "Community Outreach Representative" for the company's SafeLink account.  His time was devoted entirely to enrolling Florida residents in SafeLink's Lifeline program.  In July 2015, after he began to suspect that, and investigate whether, SafeLink and Elite were knowingly enrolling ineligible individuals into the Lifeline Program and fraudulently billing the government for wireless phones and services provided to these individuals, Relator was terminated from his job with Elite.

18.     Defendant TracFone Wireless, Inc. ("TracFone") is a private, for-profit corporation headquartered at 9700 N.W. 112th Ave., Miami, Florida, 33178.  TracFone, through

6

its SafeLink brand, is the largest provider of Lifeline wireless benefits. It operates the SafeLink

Lifeline program in 39 states and has more than 3.6 million subscribers. Ten percent of

TracFone's SafeLink customers are veterans of the U.S. Armed Services.

19.     Defendant SafeLink Wireless ("SafeLink") is a private, for-profit corporation

headquartered at 9700 N.W. 112th Ave., Miami, Florida, 33178. SafeLink is the largest provider

of subsidized wireless phones and services under the Lifeline Program. SafeLink is a wholly-

owned subsidiary of TracFone Wireless, the largest "no-contract" wireless provider in the United

States. TracFone is in turn owned by America Movil, the 5th largest cell phone company in the

world.

20.     Defendant Elite Marketing Group ("Elite") is a private, for-profit corporation

headquartered at 247 West 35th St. Suite 700, New York, NY, 10001. Elite provides marketing

services to SafeLink, including by hiring sales staff and generating promotional materials. All

sales efforts and promotional materials used by Elite to promote SafeLink's Lifeline program

must be expressly approved by SafeLink executives before use.

21.     Defendant Wissam Nasr is a resident of New York, NY. He was formerly the

National Director of Elite's SafeLink account. He was intimately involved with the

implementation of the fraudulent scheme described herein. Around January 2015, Nasr had a

falling out with other Elite executives and opened up another marketing company, Central

Marketing Systems, to compete with Elite by selling SafeLink Lifeline telephones and services.

22.     Defendant Central Marketing Systems ("Central") is a private, for-profit company

headquartered at 7712 35th Ave. Apt. B17, Jackson Heights, NY 11372. Central markets

SafeLink's Lifeline program and has implemented a scheme to defraud the federal Lifeline

Program by targeting and enrolling individuals who are not eligible for the program.

## III.   JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C §§ 3729-3730.

24.     Under 31 U.S.C. § 3730(e), to the extent there has been a statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, Relator is an original source of the allegations herein because: (1) prior to any statutorily relevant public disclosure, he voluntarily disclosed to the Government the information on which his allegations are based; and (2) he has independent knowledge that materially adds to any statutorily relevant publicly disclosed allegations or transactions and voluntarily disclosed that information to the Government before filing this action.

25.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in and have transacted business in the Middle District of Florida.

26.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact or have transacted business in this district.  At all times relevant to this Complaint, Defendants regularly conducted, and continue to conduct, substantial business within this district and/or maintain employees and offices in this district.

337766.2 338101.1

## IV.   **BACKGROUND**

### A.   **Federal Lifeline Program**

27.   "Universal Service" is the principle that all Americans should have access to communications services. "Universal Service" is also the name of the fund and the category of programs created by Federal law and overseen by the Federal Communications Commission (FCC) that implement this principle.

28.   The Telecommunications Act of 1996, 47 U.S.C. § 251 *et seq*., expanded the Universal Service programs to promote increased access to telecommunication and high-speed internet services for rural consumers and those with low incomes. The FCC established four programs within the Universal Service Fund to implement this statute. One of these programs, the "Lifeline Program," provides subsidized telecommunication services to low-income Americans.

29.   The Lifeline program is a government benefit program that provides a subsidy on monthly telephone services for eligible low-income subscribers to ensure they can connect to the nation's communications networks, call for help in an emergency, find jobs, access health care services, and connect with family and their children's schools.

30.   The Lifeline program provides subscribers a subsidy on monthly landline or wireless telephone services. In addition, the related "Link Up Program" reduces the cost of initiating phone service for eligible subscribers.

31.   Individuals are eligible for the Lifeline Program if: (1) they have an income at or below 135% of the federal Poverty Guidelines; (2) participate in one of the following need-based government assistance programs: Medicaid, Supplemental Nutrition Assistance program ("food stamps" or SNAP), Supplemental Security Income (SSI), Federal Public Housing Assistance

337766.2 338101.1

("Section 8"), Low-Income Home Energy Assistance Program (LIHEAP), Temporary Assistance to Needy Families (TANF), National School Lunch Program's Free Lunch Program; or (3) meet state-specific need-based criteria. 47 C.F.R. § 54.409(a).

32.     The Lifeline Program is funded by the Universal Service Fund.  Federal law provides the funding for this program by mandating that telecommunications carriers in the United States, such as local and long distance telephone companies, wireless and paging companies and pay phone providers, contribute set amounts to this Fund. *See* 47 C.F.R. §§ 54.706, 54.709.  Because these telecommunications companies pass on to their consumers the Universal Service Fund charges, the Universal Service Fund is ultimately generated through contributions from telecommunication consumers throughout the United States.

33.     The Universal Service Administrative Company (USAC) administers the Universal Service Fund under the direction of the FCC.  The USAC is an instrumentality of the United States.  It is a private, not-for-profit corporation that is responsible for providing every state and territory in the United States with access to affordable telecommunications services through the Universal Service Fund.

34.     Telecommunication carriers meeting certain requirements receive federal Lifeline support in the amount of $9.25 per month for each qualifying low-income consumer to which they provide services.  47 C.F.R. § 54.403(a)(1).  These payments are provided to each eligible telecommunications carrier "based on the number of actual qualifying low-income consumers it serves directly as of the first day of the month."  47 C.F.R. § 54.407(a).

35.     "In order to receive universal service support reimbursement, an eligible telecommunications carrier must certify, as part of each request for reimbursement, that it is in compliance with all the rules in [42 C.F.R. Part 54 Subpart E]."  47 C.F.R. § 54.407(d).

337766.2 338101.1

36.     Telecommunication carriers offering the Lifeline service must "[i]ndicate on all materials describing the service, using easily understood language, that it is a Lifeline service, that Lifeline is a government assistance program, the service is non-transferable, only eligible consumers may enroll in the program, and the program is limited to one discount per household." 47 C.F.R. § 54.405(c).

37.     Telecommunication carriers offering Lifeline service "must implement policies and procedures for ensuring that their Lifeline subscribers are eligible to receive Lifeline services." 47 C.F.R. § 54.410(a).

38.     "An eligible telecommunications carrier may not provide a consumer with an activated device that it represents enables use of Lifeline-supported service, nor may it activate service that it represents to be Lifeline service, unless and until it has: (1) Confirmed that the consumer is a qualifying low-income consumer pursuant to § 54.409; and (2) Completed the eligibility determination and certification required by this section . . . ." 47 C.F.R. § 54.410(a).

39.     The remainder of section 54.410 of title 47 gives specific instructions on when a carrier may enroll a consumer into the Lifeline program and seek reimbursement for providing services to that subscriber.

40.     If a prospective subscriber seeks to qualify for Lifeline based on income eligibility, except where a state Lifeline administrator or other state agency is responsible for the initial determination of a subscriber's eligibility, a telecommunications carrier "[m]ust not seek reimbursement for providing Lifeline to a subscriber" until the subscriber has certified his/her eligibility and the carrier has confirmed the subscriber's income-based eligibility by either accessing one or more databases containing information regarding the subscriber's income and

11

determining the subscriber qualifies based on income, or by reviewing documentation that establishes that the prospective subscriber meets the income-eligibility criteria.

41.     Acceptable documentation of income eligibility includes, but is not limited to, the individual's prior year's tax return, a current paystub, a Social Security statement of benefits, or a Veterans Administration statement of benefits.  47 C.F.R. § 54.410(b).

42.     Similarly, pursuant to 47 C.F.R. § 54.410(c), where a potential subscriber seeks services based on program eligibility, except in states where a state Lifeline administrator or other state agency is responsible for the initial determination of program eligibility, a carrier "[m]ust not seek reimbursement for providing Lifeline to a subscriber" unless the subscriber has certified his/her eligibility and the carrier has confirmed the subscriber's program-based eligibility by either accessing one or more databases containing information regarding enrollment in qualifying assistance programs or, if this is not possible, by reviewing documentation demonstrating that a prospective subscriber qualifies for Lifeline under the program-based eligibility requirements.

43.     If a state Lifeline administrator or other state agency is responsible for the initial determination of a subscriber's eligibility, whether the potential subscriber seeks services based on income-eligibility or program-eligibility, a telecommunications carrier "must not seek reimbursement for providing Lifeline services to a subscriber" unless the carrier has received from the state Lifeline administrator or other state agency, notice that the prospective subscriber meets the income-eligibility or program-eligibility requirements as applicable.  47 C.F.R. §§ 54.410(b)(2), 54.410(c)(2).

44.     Carriers responsible for the initial determination of a subscriber's eligibility for Lifeline must provide subscribers certification forms informing them that "Lifeline is a federal

12

benefit and that willfully making false statements to obtain the benefit can result in fines, imprisonment, de-enrollment or being barred from the program." 47 C.F.R. § 54.410(d)(1)(i).

45. In order to receive Lifeline benefits, subscribers must certify that he/she "meets the income-based or program-based eligibility criteria for receiving Lifeline, provided in § 54.409." 47 C.F.R. § 54.410(d)(3)(i).

46. Telecommunications carriers seeking payment from the Universal Fund for Lifeline service must submit annual certifications to the USAC that they have "policies and procedures in place to ensure that its Lifeline subscribers are eligible to receive Lifeline services." If a carrier confirms consumer eligibility by relying on income or eligibility databases, the carrier official making the certification "must attest annually as to what specific data sources the eligible telecommunications carrier used to confirm eligibility." 47 C.F.R. § 54.416(a)(1).

**B.** **SafeLink's Lifeline Program**

47. TracFone, the owner of SafeLink Wireless, is America's largest "no contract" wireless provider. SafeLink is the wholly-owned subsidiary through which TracFone offers Lifeline services on wireless phones.

48. SafeLink enrolls consumers in its Lifeline services in a variety of ways, including through Internet campaigns and mailing promotions. A main way SafeLink markets its Lifeline services is through in-person marketing through what it calls its "Street Team." The "Street Teams" are hired and managed by third party marketing agencies such as Elite Marketing Group and Central Marketing Systems. Members of the Street Teams are given mobile devices,

13

generally tablets, to process SafeLink applications for Lifeline services and gather eligibility
documentation.

49.    TracFone currently offers SafeLink Lifeline services in Alabama, Arkansas,
Arizona, Connecticut, D.C., Delaware, Florida, Georgia, Hawaii, Iowa, Illinois, Indiana, Kansas,
Kentucky, Louisiana, Massachusetts, Maryland, Maine, Michigan, Missouri, Mississippi, North
Carolina, New Hampshire, New Jersey, New Mexico, Nevada, New York, Ohio, Oregon,
Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Texas, Utah, Virginia,
Washington, Wisconsin, and West Virginia.

50.    Through SafeLink's Lifeline program, subscribers receive free phones and a
certain amount of free wireless services.  SafeLink applies the Universal Service Fund subsidy to
an allotment of free airtime minutes and texts and TracFone provides the wireless handset at the
company's expense.  If subscribers need more minutes, they can buy TracFone prepaid cards.  In
Florida, newly enrolled subscribers receive 500 free minutes for the first three months, 250 free
minutes after that, unlimited free text messages for the first three months, and 1,000 free text
messages per month after that.

### C.    SafeLink's Process for Enrolling Subscribers in the Lifeline Program

51.    Elite managed numerous Street Teams for SafeLink.  Elite's Street Team
members would be tasked with promoting SafeLink at particular locations where Defendants
believed there would be a significant number of people interested in signing up for a phone.  For
example, when Relator first began working for Elite, he was assigned to shelters and soup
kitchens because it was anticipated that high numbers of low-income individuals could be found
there.

337766.2 338101.1

52.     In order to enroll people in the SafeLink program while on location, Street Team members were given tablets that included a SafeLink software application (an "app") that allowed them to submit SafeLink applications and receive approvals while with the consumer.

53.     When an individual was interested in enrolling, the Street Team member would open the "Street Team" app on his/her tablet and process an application by gathering the individual's personal information (name, address, date of birth, and last four digits of their social security number), selecting a wireless plan, and then addressing the person's qualification for the program.

54.     The application had three "methods" by which an individual could qualify for the program: "applicant belongs in a program," "applicant is eligible by income," or "applicant's child or dependent belongs in a program."

55.     If the individual was applying based on participation in a government program that automatically qualified the individual for Lifeline service, such as SSI or Medicaid, the "applicant belongs in a program," option would be selected.  Once this option was selected, a screen would appear allowing the user to "select which programs the applicant participates in." The options available to the user were: Medicaid, Supplemental Nutrition Assistance Program (SNAP) Food Stamps, Supplemental Security Income (SSI), Federal Public Housing Assistance (Section 8), Low-Income Home Energy Assistance Program (LIHEAP), National School Lunch Program's Free Lunch Program, and Temporary Assistance for Needy Families (TANF).

56.     Program categories such as "veteran status," "military service," "Medicare beneficiary," "college student," "police officer," "prison security officer," "postal worker," "recently released from prison," or "resident in a hurricane state," were not listed here because

status as a member of one of these categories does not in and of itself make one eligible for the Lifeline program.

57.     If the individual was applying based on his/her income, the "applicant is eligible by income" option would be selected.  Once this option was selected, a chart would appear showing the maximum income a person could receive based on his/her household size and remain eligible for the program.  The user was directed to choose which option described the subscriber's household size.

58.     If the individual was applying based on the participation of his/her dependent in a qualifying program, the Street Team member would gather the name, birthday, and social security number of the relevant dependent and the program to which he/she belonged.

59.     Once these selections were made, the subscriber was required to make certain certifications, including stating under penalty of perjury that he/she "participate[s] in the above designated qualifying program."  The applicant would then confirm the application through an electronic signature.

60.     Once this was complete, the Street Team member had the opportunity to take a photo of any documentation the applicant had to support his/her eligibility and upload this to the application.  For example, sales staff could photograph an applicant's Medicaid card or a letter indicating his/her SSI benefits, as proof of eligibility.  Once any documentation had been photographed and uploaded to the application, the "finish" button would be selected.

61.     Almost always, approval was received directly to the tablet within three to five minutes.

337766.2 338101.1

## V.    **ALLEGATIONS**

62.    TracFone, SafeLink, Elite, Central Marketing Systems, and Nasr have engaged in a widespread scheme to bill the federal Lifeline program for wireless phones and services provided to people ineligible to enroll in the program.  As part of this scheme, they certified that they were conducting required eligibility verifications while failing to conduct such verifications. They also targeted specific applicant populations that were not categorically eligible, misled them into believing they should apply because their status as members of these groups would make them eligible for the program, and then failed to conduct income or other program participation verification to ensure they were eligible.

63.    As a result of this conduct, Defendants have knowingly presented, caused to be presented, and conspired to present false claims to an agent of the United States for payment from the Universal Service Fund Lifeline program for individuals ineligible for the program. Defendants have also knowingly avoided their obligation to repay funds received based on improper enrollment of ineligible subscribers.

64.    In September 2014, Relator was recruited to work for Elite Marketing Group on its SafeLink account.  Relator, like all Elite/SafeLink sales staff, was paid based on the number of Lifeline applications he was able to get approved.  Sales staff was paid a base amount of $5-6 per approved application and an additional volume-based bonus.

65.    Shortly after Relator was hired he was encouraged by his employer to target veterans and senior citizens for potential subscribers in SafeLink's program.  He was told, and given promotional materials to distribute that stated, that individuals who received veterans

17

benefits or Medicare benefits were categorically eligible for the Lifeline Program without additional income verification.

66.     For example, on September 4, 2014 at 9:12 pm, Laine Strutton, Manager of Elite's marketing efforts for SafeLink in Florida, forwarded Relator an email she had sent to the manager of Palms Assisted Living and Memory Care on July 29, 2014 which stated that Floridians qualified for Lifeline services if they received benefits such as "Veterans Benefits" or "Medicare Part B." Ms. Strutton also attached to her email to Relator a "SafeLink Fact Sheet" which stated that "in Florida individuals qualify [for Lifeline services through SafeLink] if they participate in a federal program[] such as Veterans Benefits, Medicare Part B . . . ."

67.     Ms. Strutton sent a similar fact sheet to Relator again on September 4, 2014 at 9:31 pm with the instruction that "[t]he Fact Sheet is for attaching to outreach emails." This "SafeLink Fact Sheet" again stated that "individuals qualify [for SafeLink's Lifeline program] in Florida if they participate in federal programs such as SNAP/EBT, Temporary Assistance for Needy Families (TANF), Veterans Benefits, Medicare Part B, [etc.]."

68.     Within a few weeks of employment, Relator was tasked with conducting SafeLink sales at veterans hospitals. He and the other Elite sales staff working on the SafeLink account were told that Florida's Department of Children and Families ("DCF") had approved SafeLink's contract to provide Lifeline services to all veterans.

69.     To ease the entry of Relator and other Elite/SafeLink sales staff into the veterans hospitals, Ms. Strutton and/or Wissam Nasr, Elite's National Director for the SafeLink account, traveled to veterans hospitals to explain the program and ensure the Elite/SafeLink staff would be welcomed. Relator is aware that Mr. Nasr personally visited at least the veterans hospitals in

18

Baldwin Park, Kissimmee, Leesburg, Orange City, Daytona Beach, Clermont, and Miami. Ms. Strutton and/or Mr. Nasr would also join Elite/SafeLink sales staff for their first day at a new veterans hospital site.

70.    Ms. Strutton and Mr. Nasr, as part of their visits to veterans hospitals to establish a new sales location, would tell the hospital directors and their staff that all employees of the VA hospital were eligible to get SafeLink Lifeline phones based solely on their status as employees of the VA. Ms. Strutton explained to Relator and on national sales calls that the purpose of this was that once these VA staff and medical professionals were enrolled they would encourage their patients to enroll as well.

71.    Neither veteran status nor employment by the veterans administration qualifies an individual for Lifeline services. However, Defendants falsely represented to Relator, the rest of the Elite/SafeLink sales staff, and VA staff, that being a veteran or working for the VA could qualify individuals for these services.

72.    As described above, Elite/SafeLink sales staff was given tablets to use to enroll individuals in the Lifeline program. When a veteran was interested in applying for SafeLink Lifeline services, the sales person would take his/her personal information (name, address, birthday, etc.) and then choose as a method of qualification "applicant belongs in a program." As explained above, when "applicant belongs in a program" was chosen as a method of qualification, there was no program option for "veteran" or "military." Relator and the rest of the Elite/SafeLink team were told that this was because the technology had not been updated yet. Because of this, they were instructed to choose the "SSI" and "Medicaid" programs and told that this would "route the application" to the appropriate team for approval.

19

73.     On September 18, 2014, Ms. Strutton emailed Relator a list of all "Florida State SafeLink Qualifications." These included "Veterans Administration Card/Veterans Benefits or Military ID" and "Medicare." Further, the document instructed that "[f]or Medicare, Veterans Benefits, Military, etc., essentially any proof that doesn't have its own box to check on the application, always check both 'Medicaid' and 'SSI.'"

74.     Relator responded to Ms. Strutton's September 18, 2014 email, and asked whether "no matter which one of those 11 qualifications you have [including Medicare and VA card] you will be approved????" Ms. Strutton responded: "Yes. The important thing to remember is that if the proof doesn't have its own box to click, then the default catch all is Medicaid and SSI."

75.     Veterans approached to enroll in the SafeLink Lifeline program were often incredulous about its authenticity and their eligibility for it. Because of this, and because SafeLink and Elite executives knew that veterans were in fact ineligible for the Lifeline program unless they qualified based on income or another program, Relator and other sales staff were directed to provide veterans with little information about their enrollment. Rather, Ms Strutton explained in a November 9, 2014 email to the Elite/SafeLink representatives staffing VA hospitals (copying Ms. Nasr): "You keep [the tablet] in your hands and just tell them to push the green confirm button [confirming their certification of eligibility]." (Later on, Ms. Strutton went even further and directed SafeLink/Elite staff to click the "confirm" button themselves while angling the tablet away from the applicant so that he/she could not see the buttons being pressed.)

76.     Sales staff was also specifically instructed not to let veterans view what boxes they checked on the enrollment application. In the same November 9, 2014 email, Ms. Strutton, instructed that "[i]f it ever comes up, we check the boxes we do for Veterans because the

20

STREET app was developed before Veterans could apply for phones, and those boxes we check send the application to the correct database where the applicant's information can be verified. It is an issue of those boxes routing the application to the right place."

77.     Defendants similarly targeted other groups ineligible for the program.  For example, Defendants told Elite/SafeLink sales staff that enrollment in Medicare made an individual eligible for the Lifeline program.  As with veterans, the application form on the tablet used by sales staff did not include a program eligibility option of "Medicare."  Elite/SafeLink sales staff was again instructed to choose "SSI" and "Medicaid" for individuals eligible because of their Medicare enrollment status.

78.     Elite/SafeLink sales staff was sent to a variety of locations to enroll individuals with veteran or Medicare beneficiary status.  For example, sales staff was sent to retirement homes and American Legion events in addition to veterans hospitals.

79.     In addition, promotional materials were utilized which encouraged those with Medicare or veteran status to apply.  For example, on February 6, 2015, Ms. Strutton emailed the sales staff with copies of a flyer to be used at VA clinics.  The flyer read "SafeLink's Free Cell Phone & Minutes Program . . . Do you have veterans benefits, a military ID, or receive Medicare?  Apply today!"

80.     As time went on, Ms. Strutton became more cautious about putting in writing that veteran status or Medicare enrollment entitled an individual to eligibility for Lifeline services.  For example, in November 2014, she instructed Relator to change the wording of promotional materials for a veterans clinic from "Free Phone Program: Federal Lifeline for Veteran's and Medicare" to "Those with Veterans Benefits or Medicare may apply" or "Federal Lifeline application available to those with Veterans Benefits or Medicare."  She explained that

21

otherwise, "it could be interpreted to mean that everyone with Veterans or Medicare gets the Lifeline Benefit."

81.     Similarly, on January 4, 2015, she instructed Relator when preparing signs for events that the material should be "posed as a question." For example, it could read "Do you have [Medicare, veterans benefits]?" and then be followed by a prompt such as "Sign up on Saturday!" She specified that this sort of careful working was necessary "for legal reasons."

82.     Despite this caution in written communications, Ms. Strutton and other Elite and SafeLink executives continued to instruct Relator and other sales staff to target and enroll veterans and those with Medicare coverage.

83.     Defendants also targeted other populations for automatic enrollment in SafeLink's Lifeline program despite the fact that their status as part of such a group did not qualify them for the Lifeline program. For instance, Relator and other Elite/SafeLink sales staff were told on regular national sales calls that in Florida, all active and retired police officers and sheriffs had been approved for the Lifeline Program and they could begin marketing to them. Relator is aware that dozens if not hundreds of Florida police officers and sheriffs were enrolled in the SafeLink Lifeline program despite the fact that they were not eligible for the program.

84.     In addition, around June 2015, Relator and other sales staff were told that because hurricane season had started in Florida, all Floridians were eligible for the SafeLink Lifeline program. Sales staff was instructed to pursue enrollment of individuals on this new basis.

85.     For example, on June 6, 2015, Relator and two other Elite marketers attended the "Make them Smile" event at Lake Eola Park. While they were there, Ms. Strutton called all of them to remind them that because it was hurricane season, DCF had approved SafeLink eligibility for all Florida residents and they could enroll any Florida resident simply by obtaining

22

his/her driver's license. However, as with the veterans, Medicare beneficiaries, and police officers, because there was no "program eligibility" option for Florida residents, sales staff was directed to select "SSI" and "Medicaid" for these individuals when processing their applications.

86.     Similarly, beginning in about 2012, SafeLink/Elite sales staff was sent to Florida college campuses and instructed to enroll anyone with a valid college ID into SafeLink's Lifeline Program.

87.     SafeLink/Elite staff also targeted and enrolled postal workers, correctional officers from Florida state and federal prisons, probation officers, and inmates recently released from prison into the SafeLink Lifeline program without appropriate income or program-participation eligibility verifications.

88.     In addition, SafeLink, through improper targeting and failure to perform required eligibility verification frequently enrolled spouses of Lifeline subscribers in the Lifeline program even though federal regulations restrict Lifeline usage to one line per household.

89.     Elite/SafeLink sales staff frequently encountered resistance from potential subscribers. They were carefully coached on how to respond to concerns about enrolling in the program. These responses demonstrate that Defendants' primary focus was not on ensuring that those in need of subsidized services obtained them, but rather that they enrolled as many people as possible.

90.     For example, if a potential subscriber objected that he/she already had a phone, sales staff was directed to respond, "Do you pay for your phone? This is free so you could stop paying for your phone!"

91.     If a person responded that they weren't eligible for the program, sales staff was directed to respond, "In Florida anyone is free to apply. Do you have your ID on you?"

92.     And if a veteran responded that he did not want to abuse the program by taking a phone he did not need when someone else might really need it, sales staff was directed to play on his patriotism and respond, "Actually, we really want to distribute as many of the free phones as possible to show that the program matters and is needed, because if not there may not be a strong enough program in the future to provide free phones to younger Veterans coming back home."

93.     SafeLink approved these improper marketing techniques. SafeLink executives were frequently on national sales calls on which these marketing plans were discussed and where it was openly stated that, for example, veterans, Medicare beneficiaries, police officers and eventually all residents in Florida were eligible for the Lifeline program, but they had to be processed by indicating that they were enrolled in the SSI and Medicaid programs. In addition, SafeLink signed off on all marketing and promotional materials. Elite/SafeLink sales staff was repeatedly told that they were forbidden from using any promotional materials without submitting them to the corporate SafeLink team for review and approval.

94.     This tacit or express approval of the targeting of ineligible populations is particularly problematic because SafeLink has failed to properly verify the eligibility of subscribers before activating their Lifeline services and seeking reimbursement from the government agent for these services. SafeLink's systematic failure to conduct appropriate eligibility verification is apparent in a number of ways.

95.     First, SafeLink's failure to conduct eligibility verification is evident from the low number of rejections Elite/SafeLink staff encountered when enrolling veterans and other individuals ineligible for the Lifeline program based solely on participation in an ineligible program. The only rejection notices Relator ever encountered were when an applicant's address was already in use on another Lifeline account. (Because of widespread concern about fraud on

24

the program, the FCC mandated that a database be created and utilized by telecommunications carriers to ensure that subscribers obtained only one subsidized phone per household.)  Relator never received a rejection because the applicant was deemed ineligible for the program for failure to be enrolled in a qualifying program or for having too much income.

96.     This lack of rejection notices is particularly notable because Relator knows of several specific instances where ineligible people (more specifically, individuals he now knows are ineligible, but at the time believed to be eligible based on their veterans status) received free phones and free SafeLink Lifeline services.

97.     For example, one veteran of the Vietnam War was enrolled in the SafeLink program in June 2015 after responding to an advertisement indicating that the only documentation needed to demonstrate his eligibility was his veterans ID card.  He confirmed to Relator in August 2015, while complaining about SafeLink's Lifeline enrollment practices, that he is not eligible for the Lifeline program based on his income or participation in any need-based government program.

98.     Similarly, in August 2015, Relator heard from another individual who had previously been successfully enrolled in the SafeLink program.  While complaining about SafeLink's enrollment practices, she noted that neither she nor another individual who had enrolled at the same event qualified for the program based on their financial status.

99.     Relator is also aware that at least 84 police officers with the Winter Park Police Department were approved for SafeLink's Lifeline services in September 2014.  The starting salary of these police officers is upwards of $50,000, which would mean that few, if any, of them would be eligible for the program based on income limits or participation in need-based

programs.  However, Relator received confirmation in October 2014 that many of them had been successfully approved and had received their phones.

100.    In addition, the mere speed of the approval process indicates that SafeLink failed to perform eligibility verification.  In Relator's experience, potential subscribers were routinely approved for services within 3 to 5 minutes of submission of their application.  It is unreasonable to imagine that in the span of a few minutes, SafeLink could perform the requisite income or program participation verification necessary to enroll these individuals in the program.

101.    This speedy approval process is particularly troubling in the case of veterans, Medicare beneficiaries, Florida residents and others who were enrolled with only a military ID card, Medicare card, college ID, or driver's license to verify their eligibility for the Lifeline program.  Because none of this documentation demonstrates status-based eligibility for the program, a sufficient eligibility determination would have required further processing to determine if the individual fell into a qualifying program or met the income requirements.

102.    When he began to question whether SafeLink was actually checking program eligibility for the individuals he was enrolling, Relator began to test the program.  In several instances, when he enrolled veterans, rather than submit an image of their veterans identification card, he took a picture of the words "Mickey Mouse," "Pluto," or "Donald Duck" and submitted these as proof of eligibility.  Unfortunately, but confirming Relator's concerns, these veterans were approved within minutes of submission of the application.

103.    Defendant Central Marketing Services has been targeting and enrolling ineligible individuals in SafeLink's Lifeline program in the same way as Elite.

104.    Around January 2015, Defendant Wissam Nasr left Elite and started a competing company, Central Marketing Systems.  Central obtained a contract to market SafeLink's Lifeline

26

program in Florida and other states across the nation.  Nasr adopted a strategy similar to Elite's –
targeting populations not categorically qualified for SafeLink's Lifeline program and enrolling
them based on their status as a member of these groups without performing further eligibility
verification and knowing that SafeLink was not performing such verification.

105.    For example, Nasr targeted veterans at Wal-Marts throughout Florida for
enrollment in SafeLink's Lifeline program even when they were not otherwise eligible.

106.    Around July 2015, after Elite laid off dozens of its staff in Florida working on its
SafeLink account, Nasr reached out to several of the former Elite/SafeLink staff and offered
them job opportunities with Central Marketing Systems' SafeLink program.

107.    Nasr told at least seven former Elite/SafeLink staff, including Relator, that he
would pay them a base salary of $500 per week plus commissions and all travel and hotel
expenses, if they agreed to work for Central Marketing System's SafeLink account, marketing
SafeLink's Lifeline program in Georgia and Tennessee using similar tactics as Elite had been
using in Florida.  For example, Nasr told Relator that he stood to make a significant amount of
money working for Central Marketing in Georgia or Tennessee because "they didn't know about
the veterans program yet."

108.    Around May of 2015, SafeLink began an effort to certify the eligibility of
veterans enrolled in the program by sending them letters indicating that they needed to provide
documentation demonstrating that they met the income requirements or were enrolled in a
qualifying federal need-based program.  When veterans objected that they had been told that
their veterans status qualified them categorically for the program they were told that they would
have to show they met the income or program participation requirements and failure to do so
would result in their having to relinquish the phone or begin paying for it.  However, SafeLink

27

did not request that these veterans pay the company back for the subsidies they had received while improperly enrolled in the program.

109.    Veterans objected strongly to this turn of events and many of them reached out to sales agents, such as Relator, who had helped enroll them in SafeLink's program.  As a result of his conversations with these veterans and independent research he conducted, Relator came to understand that SafeLink and Elite had been lying to him about the existence of a "veterans Lifeline program" or a "Medicare Lifeline program," and, in fact, these populations had never been categorically qualified for the Lifeline program.

110.    Now that Relator understands that veterans, Medicare recipients, police officers, college students, postal worker, probation officers, correctional officers, those recently released from prison, and all Floridians during hurricane season, are not, and never were, eligible for the Lifeline program based on their status as such, and in light of the evidence described herein (such as the devious method of claiming "program eligibility" on the Street Team app by indicating enrollment in the SSI and Medicaid programs for these populations, emails from veterans and police officers confirming delivery and successful use of SafeLink phones, and SafeLink's subsequent efforts to verify the income or program eligibility of previously-enrolled veterans), Relator believes, and on that basis alleges, that SafeLink has submitted tens of thousands, likely hundreds of thousands, of claims for Lifeline phones and services: (1) without performing required eligibility verification; (2) while falsely certifying that eligibility verifications were performed; and (3) for individuals ineligible for the program because of their failure to qualify based on their income or participation in need-based assistance programs, meaning promoting the notion that veterans were eligible based on program without the need for income eligibility verification using the SafeLink system.

111.    Although most of Relator's personal experience with Defendants' targeting behavior is largely specific to Florida, he has learned from other current and former Elite employees that SafeLink and its marketing partners have engaged in similar conduct nationwide.

112.    Moreover, the weaknesses in the eligibility verification program (*i.e.*, the failure to perform eligibility checks) were systemic.  As demonstrated by the Street Team manual Relator received when he was hired, SafeLink uses the same electronic devices and application software to perform enrollment throughout the country.  On that basis, and based on what Relator has learned about the targeting and improper enrollment of ineligible individuals in SafeLink's program in other states, including from Defendant Nasr about Central Marketing Systems' expansion of the "SafeLink's veterans program," Relator alleges, on information and belief, that Defendants submitted and caused to be submitted false claims for Lifeline services for individuals who did not qualify for the program nationwide.

113.    Moreover, even when SafeLink began to seek verification of eligibility from veterans, many of whom could not provide such, the company never asked Elite to refund the money it had been paid to provide marketing services or for the sales staff to refund their commissions.  Relator believes that if SafeLink were required to repay the Lifeline program for the improperly enrolled individuals it would have sought such refunds from Elite and its sales personnel.  On that basis, Relator alleges, on information and belief, that SafeLink has failed to repay the government the payments it improperly received based on its enrollment of ineligible individuals in the Lifeline program.

## Count I
## False Claims Act
## 31 U.S.C. §§ 3729(a)(1)(A)-(C), (G)

29

114.    Relator realleges and incorporates by reference the allegations contained in all paragraphs of the Complaint as if fully set forth herein.

115.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

116.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims.

117.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims.

118.    By virtue of the acts described above, Defendants knowingly and improperly avoided or decreased their obligation to pay or transmit money or property to an agent of the United States.

119.    By virtue of the acts described above, Defendants, their agents, employees and other co-conspirators knowingly conspired to submit and caused to be submitted false claims, to make, use, or cause to be made or used, false records or statements material to false claims, and conspired to knowingly and improperly avoid an obligation to pay money to the United States..

120.    An agent of the Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

121.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

30

122.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**PRAYER**

WHEREFORE, Mr. Gordon prays for judgment against the Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq*.;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.    That Plaintiff-Relator Mr. Gordon be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

4.    That Plaintiff-Relator Mr. Gordon be awarded all costs of this action, including attorneys' fees and expenses; and

5.    That Plaintiff-Relator Mr. Gordon recover such other relief as the Court deems just and proper.


Dated:  September 8th, 2015


By:    _____
                        Christopher C. Casper
                        FBN: 48320
                        ccasper@jameshoyer.com
                James, Hoyer, Newcomer & Smiljanich, P.A.
                        4830 W. Kennedy Blvd, Suite 550

31

Tampa, Florida  33609-2589
Tel:  (813) 397-2300
Fax:  (813) 397-2310

Timothy P. McCormack
tmccormack@constantinecannon.com
Molly B. Knobler
mknobler@constantinecannon.com
Constantine Cannon, LLP
1001 Pennsylvania Ave. N.W., Suite 1300N
Washington, DC 20004
Tel: (202) 204-4524
Fax: (202) 204-3501
*Subject to pro hac vice admission*

Mary Inman
minman@constantinecannon.com
Constantine Cannon, LLP
4 Embarcadero Center, 14th Fl.
San Francisco, CA 94111
Tel: (415) 766-3507
Fax: (650) 636-9709
*Subject to pro hac vice admission*

Attorneys for Plaintiff-Relator
Mr. Farrell Gordon

337766.2 338101.1

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator Farrell

Gordon hereby demands a trial by jury on all claims so triable.


Dated:  September  8ᵗʰ, 2015


By: _____

Christopher C. Casper
ccasper@jameshoyer.com
James, Hoyer, Newcomer & Smiljanich, P.A.
4830 W. Kennedy Blvd, Suite 550
Tampa, Florida  33609-2589
Tel:  (813) 397-2300
Fax:  (813) 397-2310


Timothy P. McCormack
tmccormack@constantinecannon.com
Molly B. Knobler
mknobler@constantinecannon.com
Constantine Cannon, LLP
1001 Pennsylvania Ave. N.W., Suite 1300N
Washington, DC 20004
Tel: (202) 204-4524
Fax: (202) 204-3501
*Subject to pro hac vice admission*


Mary Inman
minman@constantinecannon.com
Constantine Cannon, LLP
4 Embarcadero Center, 14ᵗʰ Fl.
San Francisco, CA 94111
Tel: (415) 766-3507
Fax: (650) 636-9709
*Subject to pro hac vice admission*


Attorneys for Plaintiff-Relator
Mr. Farrell Gordon


33